# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE

### Assigned on Briefs September 22, 2010

## JAMES R. SMITH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Putnam County**
**No. 03-0826     David Patterson, Judge**

---

**No. M2009-02077-CCA-R3-PC - Filed November 29, 2010**

---

Following a jury trial, the Petitioner, James R. Smith, was convicted of one count of rape, a Class B felony, one count of sexual battery, a Class E felony, and one count of attempted false imprisonment, a Class B misdemeanor. See Tenn. Code Ann. §§ 39-12-107(a), -13-302(b), -13-503(b), -13-505(c). This Court affirmed his convictions on direct appeal. See State v. James R. Smith, No. M2005-00615-CCA-R3-CD, 2006 WL 264468 (Tenn. Crim. App., Nashville, Jan. 31, 2006), perm. to appeal denied, (Tenn. May 1, 2006). The Petitioner filed a timely petition for post-conviction relief. Following an evidentiary hearing, the post-conviction court denied relief. In this appeal, the Petitioner contends that the post-conviction court erred in denying him relief because his rights to due process and a fair and impartial jury were violated when five jurors ate lunch at the same table as the court clerk and two potential State witnesses. He also asserts that his trial counsel was ineffective because he (1) did not file any pretrial motions besides a request for discovery; (2) should have asked the trial court to declare a mistrial when he learned about the lunch incident; (3) failed to ask the jurors what they talked about at lunch; and (4) failed to raise the lunch incident in his direct appeal. After our review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Robert Luke Chaffin, Cookeville, Tennessee, for the appellant, James R. Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; William E. Gibson, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background
Trial

In the Petitioner's direct appeal, we summarized the underlying facts as follows:

    At trial the victim, [J.A.], testified that on September 14, 2003, she walked her dog from her house down Broad Water Branch Road in rural Putnam County, as was her custom. On the return trip, a man she identified as the [Petitioner] pulled up next to her in a red Jeep and inquired about the ownership of a nearby house. When the victim responded that she did not know, the vehicle pulled away, but drove past twice more. Upon again stopping next to the victim, the [Petitioner] asked if the vehicle in the driveway of her home was for sale. The victim responded that he would have to ask the owner of the vehicle. The [Petitioner] reached down to get a piece of paper, wrote a number on it, and handed it to the victim. As she reached for the paper, he quickly exited the vehicle and apprehended her.

    The victim stated that the [Petitioner] held a green and black utility knife to her throat and ordered her to perform oral sex on him. She complied, noting at trial that this went on "[a] few minutes," until he pulled her head back and attempted to kiss her. When she resisted, he again ordered her to perform oral sex on him, with this episode lasting five to ten minutes. The [Petitioner] then pulled the victim to her feet, removed her shirt, and began touching her breasts while pushing her toward his vehicle. The victim testified that the [Petitioner] threw the utility knife into the seat of the vehicle and attempted to push her into the vehicle. When she resisted, the [Petitioner] pinned her against the back door, removed her pants, and performed oral sex on her for approximately five to ten minutes. She testified that the assailant again tried to kiss her and stated, "We can do what you want now." The victim responded by saying, "Why aren't you letting me then?" The [Petitioner] then apologized and said, "[I] didn't hurt you, at least not physically. I didn't beat you or anything." The victim was able to escape and ran home.

    Upon returning home, the victim went into her mother's bedroom and sat in a chair until her mother awakened. She testified that she was unable to tell her mother what happened until approximately 3:00 p.m. because she was stressed and frightened. She later told her older brother Peter what happened,

and took a shower and washed her clothes because she "felt dirty." The victim stated that the [Petitioner] passed by her house "[a]t least three times" in his vehicle and that a family friend was eventually able to obtain the license plate number.

Approximately three hours after the incident, the victim's mother telephoned Genesis House[1] and the Putnam County Sheriff's Department to report the incident. The victim related the incident to the responding deputy and turned over the license plate number and the receipt that the [Petitioner] handed the victim. The victim testified that she did not know the [Petitioner] and had never seen him before the incident.

On cross-examination, the victim testified . . . that she had not had any alcohol or drugs on the day of the incident and reiterated that she had never seen the [Petitioner] before. The victim stated that she believed the [Petitioner] got the utility knife out of his pocket and that he threw the knife in the vehicle as she was performing oral sex on him. She acknowledged that she did not seek medical treatment after the encounter and decided not to be examined because of the amount of time that had passed following the incident. The victim acknowledged that she told Officer Donnie Duncan that she did not have any bruises. Although she attempted to run "several times," she stated that she did not scratch the [Petitioner] because she was "so scared and stunned."

Ms. Ronney Anthony, the victim's mother, testified that on the day of the incident, she was asleep when the victim came into her bedroom. When Ms. Anthony awakened, she saw the victim sitting in a chair "shaking like a leaf, and very, very quiet." Although she repeatedly questioned the victim, she stated that it took "the best part of an hour to get any idea of what the matter was." Ms. Anthony testified that she decided to call Genesis House and the Sheriff's Department at approximately 3:00 p.m. because the [Petitioner's] vehicle had driven past their house four times. On cross-examination, Ms. Anthony testified that she and the victim's grandmother home schooled the victim and that the victim enjoyed living in the country. She further stated that she called Genesis House first because her foremost concern was for the victim's emotional state and safety.

---

[1] It appears from the record that Genesis House is an organization that aids abused women.

Peter Anthony, the victim's older brother, testified that the victim was in the kitchen when he arrived home from church on the day of the incident. He recalled that the victim appeared to be "in shock," her lips were blue, and she was not talking. Although she initially did not speak of what happened, over time she began to explain the incident "[i]n very simple language." He stated that the [Petitioner's] vehicle passed by three times and that a family friend was able to obtain the license plate number. Finally, Mr. Anthony stated that the police responded approximately three hours after he arrived.

. . . .

Deputy Tony Branch testified that he was employed by the Putnam County Sheriff's Department and that he responded to the subject incident between 5:30 and 6:00 p.m. He stated that when he arrived, the victim and her mother were on the side porch of the house, and the victim was initially not responsive. Deputy Branch stated that when the victim began talking, she gave him the license plate number of the [Petitioner's] vehicle; that it was radioed in; and that officers were sent to the [Petitioner's] residence. He further noted that the victim gave a written statement of what had occurred. Finally, he stated that he did not recall if the victim gave him the receipt the [Petitioner] had given her. On cross-examination, Deputy Branch testified that, although he had patrolled the victim's house on his regular route, he did not know the victim personally.

Deputy Ed Henley testified that he was employed by the Putnam County Sheriff's Department and that he responded to the [Petitioner's] house. When he arrived, Deputy Henley asked the [Petitioner] to come outside to talk, to which the [Petitioner] responded that this "must be about that little girl down on the creek." When Deputy Henley inquired as to what happened, the [Petitioner] stated that he saw her and asked her to get in the vehicle, which she did. The [Petitioner] then told Deputy Henley that he drove down a side road and that the victim performed oral sex on him at his request. Deputy Henley advised the [Petitioner] of his Miranda rights and asked him to again recall the incident with the victim, which he did. On cross-examination, Deputy Henley testified that he knew the [Petitioner] because of his previous service as a sheriff's department reserve.

Detective Donnie Duncan testified that he was called to investigate the subject incident. He stated that he did not take a rape kit because the alleged act involved oral sex with no ejaculation. Detective Duncan stated that,

although the victim turned over the receipt that the [Petitioner] gave her, it had "been misplaced." Detective Duncan recalled that the [Petitioner] stated that he and victim had a previous sexual relationship.

On cross-examination, Detective Duncan testified that he knew the [Petitioner] because he served as chief while the [Petitioner] was a sheriff's department reserve. He stated that he had no problems with the [Petitioner] at that time. He further stated that the victim did not call his attention to any bruises and that he did not see any scratches or bruising on the [Petitioner]. He stated that he did not recall whether he instructed the victim to see a doctor.

Charles Hardy testified that he works at the Tennessee Bureau of Investigation (TBI) crime lab as a serology and DNA analyst. He further stated that there was no DNA or physical evidence in this case. Hardy noted that he did not swab the inside of the victim's mouth to check for the [Petitioner's] DNA because, "the odds of finding that suspect's DNA are so great . . . that you're not going to get it, that it's not something that we would test for." Hardy testified that even if a DNA match was obtained, it would not indicate whether or not the contact was forced.

The [Petitioner] testified that he had worked as a mechanic with the Cookeville Housing Authority and as a cook at the Waffle House Restaurant. He noted that he had previously participated as a volunteer firefighter and as a sheriff's department reserve. The [Petitioner] stated that he lived on his father's property in a shed that he converted into a one-bedroom apartment. He testified that he had seen and been sexually involved with the victim three months prior. The [Petitioner] stated that, at that time, he saw the victim walking down the road and asked her if she needed a ride. Although she refused, the [Petitioner] stated that they began talking, that they became physically intimate, and that the victim performed consensual oral sex on him in his vehicle.

He stated that on this occasion, he saw the victim and she appeared to recognize him from their earlier encounter. The [Petitioner] recalled that he asked the victim about a nearby residence and that they began talking and eventually kissing. He testified that the encounter again progressed to her performing oral sex on him. Although the [Petitioner] stated that he did not have a utility knife in his vehicle, he admitted that officers did find a steak knife upon a consensual search of the vehicle, which he had used to trim wires

on his headlight switch. Finally, the [Petitioner] stated that his only prior arrest was for public intoxication in the mid-1980's.

On cross-examination, the [Petitioner] testified that after their first encounter, he drove down the victim's road one or two times "hoping [he] might get lucky again." Although he knew where the victim lived, he stated that he never approached her house. The [Petitioner] indicated that he did not ask about the car in the victim's driveway and did not perform oral sex on her. He estimated that their encounter lasted between fifteen and twenty minutes and further stated that he wrote his phone number on the receipt because she inquired as to how to contact him. The [Petitioner] testified that he did not try to intimidate the victim and did not force her to perform oral sex on him. He further stated that he "took off" when he realized that someone was attempting to get his license plate number because the victim stated that she was "afraid [that someone was] going to find out about this."

Billy Joe Smith, the [Petitioner's] brother, testified that the [Petitioner] came home between 12:00 and 1:00 in the afternoon and that he remained at home until 3:00 or 3:30 p.m. On cross-examination, he testified that he lives in the house with his father, while the [Petitioner] lives in the converted shed, where he has resided for three years. Amy Smith Holloway testified that the [Petitioner] is her father and that she spoke with him by phone at his home between 1:30 and 2:30 p.m. On cross-examination, she testified that she talked to the [Petitioner] for ten to fifteen minutes and admitted that she did not know what happened after their conversation.

Sara Bright testified that she was married to the [Petitioner] for five years and that he has a good reputation for honesty and truthfulness. On cross-examination, she stated that she and the [Petitioner] divorced in 1986 and that he has since remarried. Amanda Wright testified that she has known the [Petitioner] for approximately four years as a co-worker at the Waffle House and that he has a good reputation for honesty and truthfulness. On cross-examination, she acknowledged that she has socialized with the [Petitioner] outside of work only one or two times. Geneleta Ashburn testified that she was previously employed at the Waffle House for sixteen years and has known the [Petitioner] "as a very good friend." She likewise stated that he has a good reputation for honesty and truthfulness. On cross-examination, she acknowledged that she has not worked with the [Petitioner] in two years, but stated that she has made an effort to keep in touch with him by phone.

David Carlile testified that he has known the [Petitioner] for between fifteen and eighteen years and that he has a good reputation for honesty and truthfulness. On cross-examination, he admitted that he has not seen the [Petitioner] in two years. Additionally, the State stipulated that the testimony of Freddie Judd, owner of L & J Market, and Richard McBroom, fire chief and city manager of Baxter, would be consistent with the previously presented character witnesses. Following the presentation of evidence, the [Petitioner] was convicted of rape, sexual battery, and attempted false imprisonment.[2]

State v. James R. Smith, No. M2005-00615-CCA-R3-CD, 2006 WL 264468, at *1-5 (Tenn. Crim. App., Nashville, Jan. 31, 2006) (footnotes in original), perm. to appeal denied, (Tenn. May 1, 2006).

### Post-Conviction Hearing

The Petitioner filed a timely petition for post-conviction relief on October 19, 2006. In his petition, the Petitioner claimed that his trial counsel was ineffective for, among other reasons, failing to ask the trial court to declare a mistrial after it was discovered that five jurors ate lunch at the same table as the court clerk and two sheriff's deputies who were potential State witnesses, and failing to present the issue in his direct appeal. The Petitioner also asserted that his due process rights were violated when the trial court failed to sua sponte order a new trial after seeing the jurors at the same lunch table as the deputies. The Petitioner's post-conviction hearing was held on September 18, 2009.

Judge Leon Burns testified that he presided over the Petitioner's trial. He stated that, although he did not remember the specific instruction he gave the jury during the Petitioner's trial, the standard instruction includes an admonition that jurors should not discuss the case with any of the witnesses or attorneys in the case.[3] Judge Burns recalled that he had "[s]ome vague memory" of an incident during the Petitioner's trial when he noticed that some members of the jury, the court clerk, and two deputies were sitting at the same table in a restaurant during lunch. He recalled that he thought he approached the table and told them

---

[2] The record reflects that Count One was based upon the act of forced fellatio; Count Two on forced cunnilingus; and Count Three on the [Petitioner's] attempt to force the victim into the vehicle.

[3] In fact, the Petitioner read the trial court's admonition from the trial transcript into the record as follows:

> [D]uring the course of the trial you should not talk with any witnesses, the [D]efendant or attorney involved in the case. Please do not talk with them about any subject whatsoever. You may see them in the hallway or on the elevator or . . . other locations. If you do, perhaps the best standing rule would be not to say anything to the participants.

to separate. Judge Burns also explained that he thought the jurors sat with the deputies because it was crowded and it was the only place to sit down.

Although Judge Burns did not have a specific recollection about what occurred after he witnessed the jurors at the same table as the court clerk and two deputies, he said that it seemed "like I did ask them about it." However, he stated that he could not "specifically remember what responses" he received. Judge Burns elaborated, "But if I did not declare a mistrial, I must have come to the conclusion that there was no discussion about the case, that it was just a casual contact there and they weren't talking about the testimony in the case. I found no prejudice, so I did not grant a mistrial."

Marcia Borys testified that she is the Circuit Court Clerk for Putnam County. She recalled that she acted as the court clerk during the Petitioner's trial. She also remembered going to lunch, at the invitation of one of the jurors, with a group of jurors from the Petitioner's trial. Ms. Borys testified that two deputies, Donnie Duncan and Ed Henley, were already eating at the restaurant that she and jurors went to. She added, "[T]he restaurant was very crowded and we were headed toward the back. And Mr. Watts[4] just said sit down and so we did." She recalled that Judge Burns later approached the table and told the jurors and deputies that they should not be sitting together. Ms. Borys said that there was no conversation about the trial at the lunch table and that the desputies "were very quiet and just ate their lunch and left." She also recalled that Judge Burns questioned her and the jurors about the incident after they returned from lunch.

Davis Watts testified that he was a juror in the Petitioner's trial. He recalled that the trial court instructed the jurors not to talk to the witnesses or attorneys in the case. Mr. Watts stated that he and some of the other jurors had lunch at a small café across from the courthouse. He "vaguely" remembered that there were two sheriff's deputies at their table. He testified that he did not remember any conversation between the jurors and the deputies. Mr. Watts did recall that Judge Burns asked the group to disperse and commented that they should not be sitting together. He also stated that Judge Burns questioned the jurors after they came back from lunch. Mr. Watts explained that he did not know that the two deputies were potential witnesses in the Petitioner's trial.

Hazel Lemka, also a juror in the Petitioner's trial, testified that she remembered the trial court telling the jurors that they were not to speak to the attorneys or witnesses in the case. She said that, during the trial, a small group of the jurors went to the café across the street for lunch and that Ms. Borys "might have" went with them. When asked if she

---

[4] Davis Watts was one of the jurors from the Petitioner's trial. He was also the juror who invited Ms. Borys to go out to lunch with the group.

remembered sitting down at a table with two deputies, she replied, "I remember the place was crowded and we had a short time. We got our tray and just sat down at the nearest empty chair." Ms. Lemka said she did not remember Judge Burns saying anything to the group while they were at the restaurant, however, she did remember him speaking to them after lunch. She recalled, "He asked if we had discussed anything, talked about anything that happened in the courtroom or at the trial and we said no." She said that, other than saying hello, she did not speak to the deputies during lunch.

Pamela Malone, another juror from the Petitioner's trial, testified that she recalled that Judge Burns instructed the jury that they could not talk to anyone who was participating in the trial. Ms. Malone testified that she remembered going to lunch with the other jurors. However, when asked if she remembered that two sheriff's deputies were sitting at their table, Ms. Malone maintained that the deputies were not seated at the same table as the jurors. She also stated that the jurors did not talk about the trial during their lunch. Ms. Malone said that she did not recall Judge Burns coming up to their table and speaking to them during lunch. However, she did remember that he questioned the jurors individually after they came back from lunch.

John Magura, also a juror in the Petitioner's trial, described the lunch outing in question as follows:

> I believe I walked over there, got a plate of food, was looking for a place to sit down. I think that Mr. Watts asked me if I wanted to come and sit down. I sat down at the table, I believe Judge Burns came in, saw the two, I don't even remember if there were two, but I just remember him coming over and that there were some deputies over there sitting in the vicinity, I couldn't tell you if they were, these tables are real long, so there were multiple people sitting at the table. But I believe he said something to them and they got up and moved where they were sitting.

Mr. Magura testified that he did not remember Judge Burns questioning the jurors individually after lunch. He also stated that he did not think that he discussed the trial with anyone during lunch.

Deputy Ed Henley, employed by the Putnam County Sheriff's Department, testified that he thought he was introduced to the jury as a potential witness during the Petitioner's trial. He recalled that he ate lunch with Chief Deputy Donnie Duncan, but that the two men "[d]idn't really talk about anything." He stated that he saw Ms. Borys come into the restaurant with a group of people, but that he did not know they were jurors. He described that he and Chief Deputy Duncan were "sitting at the table and of course the restaurant was

real crowded that day, so they come in and found a seat wherever they could and sat down." He recalled that the group, which he later found out was composed of jurors, sat at the same table with him and Chief Deputy Duncan. However, he maintained that neither of the two men said anything to the jurors or Ms. Borys. Deputy Henley testified that, after lunch, Judge Burns asked him whether the deputies had talked about the case at the restaurant and that he told Judge Burns they had not.

The Petitioner testified that he thought his trial counsel was ineffective because he "never s[a]t down with me and my witnesses at one time" to discuss "what kind of questions he was going to ask us." He also alleged that his trial counsel did not meet with him enough before trial, recalling that he only met with trial counsel four or five times. The Petitioner stated that he thought his trial counsel should have filed pretrial motions, including a request for a bill of particulars, a motion to suppress his statement, and motions to exclude the AutoZone receipt and the photograph taken of him the night of his arrest. Specifically, with regard to the photograph, the Petitioner testified, "I had been locked up in a jail cell for some four or five hours before the photograph was taken. I had been laying down, been asleep, and I looked pretty messed, pretty rough." The Petitioner also testified that his trial counsel did not show him the discovery he had received from the State until the day before his trial.

The Petitioner stated that he felt his trial counsel was ineffective for failing to ask that a mistrial be declared after the trial court disclosed that it observed five jurors having lunch at the same table as two potential State witnesses. Further, he said that his trial counsel should have questioned the jurors, rather than relying on the questions asked by the trial court. He also said that he believed his trial counsel should have asked the jurors what they talked about during lunch. The Petitioner explained that he felt that, by sitting at the same lunch table, the jurors had "made a social connection with the two deputies" and that he felt the jurors were "totally in favor of the [S]tate."

The Petitioner testified that his trial counsel should have contested the relevance of the testimony of the TBI expert because no DNA testing was done in the case. He explained that he felt the language the TBI expert used "made the jury mad" at him. He also testified that had his trial counsel requested that the jury be sequestered, they would have never had lunch at the same table as the two deputies. The Petitioner also asserted that his trial counsel should have asked for a mistrial to be declared when he found out that the trial court had ex parte communication with the jurors at the restaurant. Further, he said that his trial counsel should have raised the issue in his direct appeal.

The Petitioner testified that the trial court should have sua sponte declared a mistrial after he saw the jurors eating lunch at the same table as the two potential State witnesses. He also asserted that the trial court erred when it questioned the jury about their progress on

reaching a verdict, after they had informed the trial court that they were deadlocked.  He elaborated, "I felt that the judge was trying to push them into making a decision one way or the other."

On cross-examination, the Petitioner acknowledged that there were no fact witnesses who could have testified on his behalf and that his trial counsel presented the testimony of eight character witnesses.  The Petitioner also admitted that his trial counsel did object when the State moved to introduce the Petitioner's photograph into evidence, but that the trial court overruled his objection.

The Petitioner's trial counsel ("Trial Counsel") testified that he had been an attorney for forty years and, before working at the District Public Defender's Office, he worked as an Assistant District Attorney, in private practice, and as a Federal Bureau of Investigation agent.  He testified that he and his investigator "thoroughly investigate[d]" the Petitioner's case, even conducting a "neighborhood investigation," in which they spoke to all of the neighbors in the area around where the alleged rape occurred.

Regarding the lunch incident, Trial Counsel testified that he thought Judge Burns did a good job of questioning the jurors and that he "didn't know of anything else [he] could ask."  Trial Counsel also explained that he felt like he had a "good jury" and that "it was [his] strategy to leave the jury in place."  When asked why he did not file a motion for a new trial on the issue of the trial court's ex parte communication with the jurors, Trial Counsel explained, "I didn't see anything improper that [Judge Burns] had said to them or anything."

Trial Counsel stated that he was pleased with the outcome of the Petitioner's trial because rather than finding him guilty of two counts of aggravated rape, a Class A felony, and one count of aggravated kidnapping, a Class B felony, as he was charged, the jury convicted the Petitioner of the lesser-included offenses of rape, a Class B felony, sexual battery, a Class E felony, and attempted false imprisonment, a Class B misdemeanor.

The post-conviction court denied the Petitioner's request for relief.  He now appeals.

**Analysis**

In this appeal, the Petitioner contends that the post-conviction court erred in denying him relief because: (1) his rights to due process and a fair and impartial jury were violated when five jurors ate lunch at the same table as the court clerk and two State witnesses; and (2) he received ineffective assistance of counsel.

To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing.  See Tenn.

Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

## I. Due Process

The Petitioner claims that he was denied his rights to due process and a fair and impartial jury when five jurors ate lunch at the same table as the court clerk and two State witnesses. The State argues that the Petitioner is not entitled to post-conviction relief on this issue because he did not present it for review in his direct appeal.[5] We agree with the State that the Petitioner has waived this issue because "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g). This issue could have been presented on direct appeal. Thus, the Petitioner is not entitled to post-conviction relief on this issue.

## II. Ineffective Assistance of Counsel

The Petitioner contends that he received ineffective assistance of counsel. Specifically, he asserts that his trial counsel was ineffective because he (1) did not file any pretrial motions other than a request for discovery; (2) should have asked the trial court to declare a mistrial when he learned that five jurors ate lunch at the same table as the court clerk and two State witnesses; (3) failed to ask the jurors what they talked about at lunch; and (4) failed to raise the lunch incident in his direct appeal.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases.

---

[5] In his direct appeal, the Petitioner raised three issues: (1) Whether the charges of sexual battery and false imprisonment merged into the conviction of rape; (2) Whether the trial court erred when it sentenced the Petitioner to eight years to serve in jail and did not consider alternative sentencing; and (3) Whether the State presented sufficient evidence to convict him.

Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

**A. Pretrial Motions**

The Petitioner alleges that his trial counsel was ineffective for failing to file pretrial motions, including a request for a bill of particulars, a motion to suppress his statement, and motions to exclude the AutoZone receipt and the photograph taken of him the night of his

arrest. The post-conviction court accepted Trial Counsel's testimony and found that the Petitioner's allegations were without merit and not supported by proof.

We agree with the post-conviction court that Trial Counsel was not deficient for failing to file any pretrial motions other than a request for discovery. Trial Counsel stated that he intentionally did not file any other pretrial motions. He said that he did not file a motion to suppress the Petitioner's statement to Deputy Henley because the Petitioner was not in custody when he made the statement. He explained, "I had rather concentrate on investigating the case, which I had been trying to do and [his private investigator] had been trying to do, as opposed to filing motions I'm not going to possibly win." Moreover, he testified that he felt the introduction of the Petitioner's statement was beneficial because it showed the jury that the Petitioner consistently told the same version of events—that the sexual encounter was consensual. With regard to why he did not try to exclude any mention of the AutoZone receipt that the police misplaced, Trial Counsel said that it was part of his strategy to argue that "you just don't go out and commit a heinous crime that you can go to jail for fifteen to twenty[-]five years for and leave your phone number. That doesn't make any sense." Trial Counsel said that he did not ask for a bill of particulars because the victim testified during the preliminary hearing and he felt that her allegations were clear. He testified that he did object to the introduction of the Petitioner's photograph during trial and stated that he chose not to file a motion in limine because, in his experience, the trial court would not have ruled on the motion until the trial, even if it was filed in advance.

In its order, the post-conviction court credited the testimony of Trial Counsel and found that his representation had not been deficient in any way. The post-conviction court also found that the Petitioner failed to present clear and convincing evidence that he was prejudiced by his trial counsel's failure to file pretrial motions. We conclude that the post-conviction court properly denied the Petitioner relief on this issue.

### B. Failing to Request a Mistrial

The Petitioner contends that his trial counsel was ineffective for failing to request that the trial court declare a mistrial after he learned that some of the jurors ate lunch at the same table as the court clerk and two State witnesses. Initially, we note that "[a] mistrial is usually appropriate in a criminal case only where there is a 'manifest necessity.'" State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Id.

In its order, the post-conviction court made the following findings:

1. Judge Leon Burns properly admonished trial jurors prior to the lunch break not to speak with others.

2. Clerk Borys and the jurors briefly joined two State witnesses, specifically Deputy Ed Henley and Deputy Donnie Duncan at a large table.

3. Judge Burns also ate at the restaurant. He arrived shortly after the [sic] Borys and jurors and addressed the group, whereupon the deputies immediately left the table.

4. Following the lunch break, Judge Burns individually questioned, on the record, each juror and both deputies.

5. Following this questioning, the [c]ourt determined to its satisfaction that no inappropriate conduct had taken place since the admonitions given to the jurors prior to the lunch break were kept by the jurors.

. . . .

The [c]ourt finds that further questioning by [Trial Counsel] would not have been successful in the declaration of a mistrial and that there was no reason for the [t]rial [c]ourt to declare a mistrial regarding this issue.

The [P]etitioner has not shown any prejudice caused by the actions of the jurors and the State's witnesses during his trial. Neither has the [P]etitioner shown ineffective assistance of counsel regarding this issue. These allegations are without merit.

Regarding the lunch incident, Trial Counsel said that he did not see any grounds for a mistrial to be declared. He also testified that he felt like he had a "good jury" and that "it was [his] strategy to leave the jury in place." Four of the jurors involved in the lunch incident testified at the Petitioner's post-conviction hearing. However, none of them testified that there was any conversation about the trial while they ate lunch. Further, our review of the trial transcript convinces us that the trial court thoroughly investigated the lunch incident. After the lunch recess, the trial court informed the attorneys that it had witnessed several jurors sitting at the same table as two potential State witnesses, "suggested that the witnesses shouldn't be there," and "admonished the jurors that they should not let their familiarity or relationship in any way interfere with their verdict and fairness in the case." The trial court then began individually questioning each of the jurors involved, Ms. Borys, and the two deputies. Ms. Borys, Chief Deputy Duncan, and Deputy Henley each testified that there was

no discussion of the case during lunch from anybody at the table. Each of the five jurors involved in the lunch incident testified that there was no discussion of the case by anyone seated at the table and that sitting at the table with the two deputies would not influence their evaluation of the deputies' testimony. Moreover, the Petitioner failed to show by clear and convincing evidence that he was prejudiced by the failure of his trial counsel to request that the trial court declare a mistrial. Therefore, we conclude that the post-conviction court properly denied the Petitioner relief on this issue.

### C. Questioning the Jurors

The Petitioner alleges that his trial counsel was ineffective for failing to ask the jurors what they discussed during lunch. He asserts that his trial counsel should have asked the jurors about their conversation in order "to determine if it was prejudicial to his client."

During the Petitioner's post-conviction hearing, Trial Counsel testified that he thought the trial court did a good job of questioning the jurors and that he "didn't know of anything else [he] could ask." After hearing the proof presented at the hearing, the post-conviction court stated, "The [c]ourt finds that further questioning by [Trial Counsel] would not have been successful in the declaration of a mistrial and that there was no reason for the [t]rial [c]ourt to declare a mistrial regarding this issue." Moreover, we note that the Petitioner failed to present clear and convincing evidence that he was prejudiced by his trial counsel's actions. Thus, we conclude that the post-conviction court properly denied the Petitioner relief on this issue.

### D. Appeal

The Petitioner asserts that, in his direct appeal, his trial counsel should have raised the issue of the jurors eating lunch at the same table as two State witnesses. However, the Petitioner failed to present clear and convincing evidence that he was prejudiced by his trial counsel's decision not to raise the lunch incident in his direct appeal. Therefore, we conclude that the post-conviction court properly denied the Petitioner relief on this issue.

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the denial of post-conviction relief.

_____
DAVID H. WELLES, JUDGE